

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal Action |
| VS. ) | No:  15-0240 |
| ) | |
| MICHAEL A. LORD (01) ) | |
| RANDALL B. LORD (02) ) | |

_____


OFFICIAL TRANSCRIPT OF PROCEEDINGS - CHANGE OF PLEA HEARING
ON APRIL 19, 2016, AT 3:00 P.M.
BEFORE THE HONORABLE S. MAURICE HICKS, JR.,
UNITED STATES DISTRICT JUDGE,
IN SHREVEPORT, LOUISIANA

**FOR THE GOVERNMENT:**
AUSA Cytheria Jernigan
U.S. Attorney's Office
300 Fannin Street, Suite 3201
Shreveport, Louisiana  71101-3068

**FOR THE DEFENDANTS:**
Mr. Paul J. Carmouche
Barham Warner Stroud Carmouche, L.L.C.
920 Pierremont Road, Suite 412
Shreveport, Louisiana  71106

Produced by mechanical stenography, transcript produced by computer.

_____
**MARIE M. RUNYON, RMR, CRR**
FEDERAL OFFICIAL COURT REPORTER
300 FANNIN STREET, ROOM 4212
SHREVEPORT, LOUISIANA  71101
(318) 934-4756

```
 1        (Court called to order with both defendants
 2        present at 3:05 p.m.)
 3            THE COURT:  Thank you.  Court will come to order.
 4   Please be seated.
 5        Mr. Jackson, you're back into your old haunts, finally.
 6            THE DEPUTY MARSHAL:  Yes, Your Honor.  Glad to be
 7   back.
 8            THE COURT:  Glad you decided to come back.  They took
 9   your cubicle down while you were gone.
10            DEPUTY MARSHAL JACKSON:  I didn't have a place to
11   work or do anything for a week, so . . .
12            THE COURT:  I think Marshal Whitehorn may have worked
13   that into the system.  I'm not sure.
14            DEPUTY MARSHAL JACKSON:  I'm positive.
15            THE COURT:  All right.  I know all your Grambling
16   memorabilia about the band mysteriously disappeared for that
17   length of time while you were in training.
18            DEPUTY MARSHAL JACKSON:  There's always more.
19            THE COURT:  There's always more.
20        And I did find out from Mr. Jackson that when he played
21   the Grambling band, that they practiced eight hours a day.
22   Which explains why they were so good.
23        Did you get through school?
24            DEPUTY MARSHAL JACKSON:  I did.  In three and a half
25   years.
```

1    THE COURT:  It must have been the band practice that

2  did that.

3    All right.  Today we have the hearing, a single hearing

4  perhaps at the same time, for two guilty pleas to be entered.

5  First is United States of America vs. Randall B. Lord, and the

6  second is United States vs. Michael A. Lord.

7    In this particular matter, Ms. Jernigan, do you believe

8  that they can be handled at the same time?

9    MS. JERNIGAN:  I do, Your Honor.

10    THE COURT:  And Mr. Carmouche?

11    MR. CARMOUCHE:  Yes, Your Honor, I do.

12    THE COURT:  Mr. Carmouche, the Court notes that you

13  represent both individual defendants in this, Randall Lord as

14  well as Michael Lord.

15    And the Court would like to draw attention to the fact

16  that on December 8, 2015, following the initial appearance and

17  arraignment of the defendants, the defense counsel, Paul

18  Carmouche, moved to enroll as counsel for both defendants, at

19  which time essentially a *Garcia* hearing was held, but the

20  results of the Garcia hearing did not make it into the minute

21  entry.  That has now been corrected with the minute entry

22  having been filed April 14, 2016, in which Magistrate Judge

23  Hornsby allowed both parties to be represented by the same

24  lawyer.

25    Do you have any objection to the wording in that minute

1    entry, Mr. Carmouche?

2              MR. CARMOUCHE:  No objection, Your Honor.

3              THE COURT:  And with respect to your clients, they

4    still maintain that they are comfortable being represented by

5    you, Mr. Carmouche?

6              MR. CARMOUCHE:  That's correct, Your Honor.

7              THE COURT:  All right.  Any objection from either of

8    you gentlemen?

9         (No response.)

10             THE COURT:  Oral.  Let's do Michael Lord first.

11             DEFENDANT MICHAEL LORD:  No, no objection.

12             DEFENDANT RANDALL LORD:  No objection.

13             THE COURT:  Thank you.

14        All right.  In this instance, Ms. Jernigan, there has

15   been a Rule 11 package filed on behalf of each defendant?

16             MS. JERNIGAN:  Your Honor, there have been Rule 11

17   packages executed by the parties that include signed plea

18   agreements, elements of the offense, and understanding of

19   maximum penalty and constitutional rights, and I tender those

20   now for the Court.

21             THE COURT:  All right.  You may tender those to the

22   clerk at this time.

23        Mr. Carmouche, if you'd go ahead and bring your clients

24   up to the center podium, please.

25        All right.  Just so that the record is clear and

1    Ms. Runyon knows who's speaking, we'll start with the eldest.

2    Would you introduce yourself to the Court, please, sir.

3            DEFENDANT RANDALL LORD:  Randall Brown Lord.

4            THE COURT:  All right.  And the younger?

5            DEFENDANT MICHAEL LORD:  Michael Lord.

6            THE COURT:  All right.  And don't switch, because it

7    will confuse the Court as well as the court reporter, and

8    that's a bad thing.

9        Mr. Carmouche, how do your clients intend to plead today?

10           MR. CARMOUCHE:  They intend to enter a plea of guilty

11   to Count 1 of the indictment.

12           THE COURT:  All right.  And with respect to Michael

13   Lord, is there a second count?

14           MR. CARMOUCHE:  Yes, there's a second count.  It's

15   the last count.

16           THE COURT:  15?

17           MR. CARMOUCHE:  15.  That's correct, Your Honor.

18           THE COURT:  All right.  And for the Court's purposes,

19   the Court will note that Count 1 in both indictments -- or,

20   excuse me, the single indictment -- is the same thing and only

21   Michael Lord is included in Count 15.  Am I correct on that?

22           MR. CARMOUCHE:  Yes, sir.

23           THE COURT:  In the indictment?

24           MR. CARMOUCHE:  That's correct, Your Honor.

25           THE COURT:  All right.  In this particular instance,

1    we need to have each of you sworn in, as we would any witness.

2          DEFENDANT RANDALL LORD:  Okay.

3       (Defendants sworn simultaneously.)

4          THE COURT:  Both of you have now been sworn to tell

5    the truth in a United States district court.  What that means

6    is that your answers to my questions must be truthful.  If

7    they're not, you subject yourself to having additional charges

8    filed, perhaps even for perjury.  Is that clear?

9          DEFENDANT RANDALL LORD:  Yes, sir.

10         DEFENDANT MICHAEL LORD:  Yes.

11         THE COURT:  All right.  And in this instance, with

12   respect to Count 1, both of you are included in Count 1,

13   described as a conspiracy to operate an unlicensed MSB.  Is

14   that your understanding?

15         DEFENDANT RANDALL LORD:  Yes, sir.  Yes, it is.

16         THE COURT:  All right.  And in this particular

17   instance, Count 1 has to do with bitcoins.  I would ask you to

18   explain that to me, but I'm not totally clear on the concept of

19   what nonexistent money is that I can't hold in my hand and

20   place in my piggy bank each evening when I clear out my

21   pockets.

22        The MSB, in this particular instance, has to do with

23   so-called internet transactions of this internet currency; am I

24   correct?

25         DEFENDANT RANDALL LORD:  Yes, sir.

1          DEFENDANT MICHAEL LORD:  Yeah.

2          THE COURT:  And you were both involved in that

3    particular matter?

4          DEFENDANT RANDALL LORD:  Yes, sir.

5          THE COURT:  And an "MSB" is also described in the

6    indictment as a money servicing business.  Are you aware of

7    that?

8          DEFENDANT RANDALL LORD:  Yes, sir, I am.

9          DEFENDANT MICHAEL LORD:  (Nods head.)

10         THE COURT:  And be sure to answer loud enough for our

11   court reporter to pick up.  I understand everybody is nervous

12   when they stand there.  And that bar microphone there in front

13   of you should be sensitive enough to pick up your responses,

14   but please speak your responses clearly.

15         DEFENDANT MICHAEL LORD:  Okay.

16         THE COURT:  Now, both of you have read the indictment

17   filed against you on Count 1?

18         DEFENDANT RANDALL LORD:  Yes, sir.

19         DEFENDANT MICHAEL LORD:  Yeah.

20         THE COURT:  And you fully discussed Count 1 with your

21   attorney?

22         DEFENDANT RANDALL LORD:  We did.

23         DEFENDANT MICHAEL LORD:  Yes.

24         THE COURT:  And in this instance, is there any need

25   to read Count 1 in this matter, Mr. Carmouche?

1    MR. CARMOUCHE:  I don't think so, Your Honor.  We've

2  gone over it quite extensively.

3    THE COURT:  And do you believe that your clients

4  understand the nature of the charge contained in Count 1?

5    MR. CARMOUCHE:  Yes, they do.

6    THE COURT:  All right.  Let me ask that question

7  specifically.  Mr. Randall Lord, do you understand the charge

8  contained in Count 1?

9    DEFENDANT RANDALL LORD:  I do.

10    THE COURT:  And what you are charged with criminally

11  having done wrong?

12    DEFENDANT RANDALL LORD:  I understand that, yes, sir.

13    THE COURT:  Mr. Michael Lord, likewise, do you

14  understand the charge contained in Count 1?

15    DEFENDANT MICHAEL LORD:  Yes, sir.

16    THE COURT:  All right.  With respect to Count 15 in

17  this instance, we have Michael Lord being named in a violation

18  of 21, U.S. Code, Section 846, which is a so-called drug

19  conspiracy.

20    Michael Lord, have you been over that count with your

21  attorney?

22    DEFENDANT MICHAEL LORD:  Yes, sir.

23    THE COURT:  Do you have an understanding of what that

24  drug conspiracy consists of?

25    DEFENDANT MICHAEL LORD:  Yes, sir.

1        THE COURT:  And in this instance, do you have any

2  questions you need to ask me about that particular count?

3        DEFENDANT MICHAEL LORD:  No questions.

4        THE COURT:  And you've had sufficient time to discuss

5  Count 15 with your attorney?

6        DEFENDANT MICHAEL LORD:  Yes, sir.

7        THE COURT:  All right.  Now, let me ask you this:

8  With respect to Count 1, Mr. Randall Lord, how do you intend to

9  plead today?

10        DEFENDANT RANDALL LORD:  Guilty.

11        THE COURT:  Mr. Michael Lord?

12        DEFENDANT MICHAEL LORD:  Guilty.

13        THE COURT:  And, Michael Lord, with respect to

14  Count 15, how do you intend to plead to that count?

15        DEFENDANT MICHAEL LORD:  Guilty.

16        THE COURT:  All right.  In this instance, I need to

17  advise you that in pleading guilty to these respective counts,

18  that both of you during the course of this hearing will admit

19  your guilt in fact to the charges in Count 1; and Mr. Michael

20  Lord, also in Count 15.  Do you understand that you'll have to

21  do that today?

22        DEFENDANT RANDALL LORD:  Yes, sir.

23        DEFENDANT MICHAEL LORD:  Yes, sir.

24        THE COURT:  Up till now, you've had the right to

25  remain silent, that is, that there is the right to not

1   incriminate yourself, not admit your guilt.  That's

2   constitutionally protected.  However, the first order of

3   business for me to continue with this hearing is to determine

4   whether you wish to give up that right so that we can continue

5   the hearing.

6        Mr. Randall Lord, do you give up the right to remain

7   silent?

8            DEFENDANT RANDALL LORD:  I do.

9            THE COURT:  Mr. Michael Lord?

10           DEFENDANT MICHAEL LORD:  Yes, sir.

11           THE COURT:  All right.  In this instance, we actually

12  have two different witnesses to present, Ms. Jernigan; am I

13  correct on this?

14           MS. JERNIGAN:  That's correct, Your Honor.

15           THE COURT:  All right.  Mr. Carmouche, you can take

16  your clients back to counsel table, since this will be a little

17  bit longer than usual.

18       And, gentlemen, I want you to listen to the testimony of

19  these agents, because I'll ask you a question or two about what

20  you heard.

21       You may call your witness.

22           MS. JERNIGAN:  The Government calls Agent Heusel.

23       (Witness sworn.)

24           THE COURT:  You may proceed.

25           MS. JERNIGAN:  Thank you, Your Honor.

```
1                      DIRECT EXAMINATION
2    BY MS. JERNIGAN:
3    Q.    Good afternoon, Agent Heusel.  Would you please state
4    your name for the record.
5    A.    Darrin Heusel, D-a-r-r-i-n.  Heusel is H-e-u-s-e-l.
6    Q.    And how are you currently employed?
7    A.    I'm currently employed with the IRS Criminal
8    Investigations Division.
9    Q.    And are you familiar with the investigation involving the
10   defendants appearing before the Court this afternoon, one
11   Michael A. Lord and Randall B. Lord, and the reports regarding
12   the same?
13   A.    Yes.
14   Q.    The defendants are charged in Count 1 of the indictment
15   with conspiracy to operate an unlicensed MSB.  Is it the case
16   that Michael Lord is the son of Randall Lord?
17   A.    That is the case.
18   Q.    And they both were involved in a bitcoin business?
19   A.    That's correct.
20   Q.    Can you give the Court a brief summary of what "bitcoin"
21   is and how it functions.
22   A.    A "bitcoin" is a decentralized form of currency that is
23   traded on the internet.  It is not backed by any government or
24   company.  It is simply a computer software operating where they
25   exchange peer to peer.
```

1  Q.    How do you, those who possess or own bitcoin, keep up or

2  track such currency?

3  A.    They keep up with it in an electronic wallet that is

4  either on a computer or on a device.

5  Q.    How does one go about acquiring bitcoin?

6  A.    They generally purchase it through an exchanger or a

7  broker.

8  Q.    And is that the business that the Lords were in?

9  A.    That's correct.

10  Q.    Crypto Processing Solutions, Data Security, Pelican

11  Mining, Quantum Health, and Jewella Chiropractic Clinic -- are

12  you familiar with those business names in connection with this

13  investigation?

14  A.    Yes, I am.

15  Q.    How do they relate to the bitcoin business operated by

16  Michael Lord and Randall Lord?

17  A.    Those were entities or businesses where currency was

18  exchanged for the purchase of bitcoins.

19  Q.    And let me back up.  Could you explain or describe the

20  educational and professional background of the defendants for

21  the Court.

22  A.    Randall Lord is primarily a licensed -- or was a licensed

23  chiropractor, trained chiropractor.  Michael Lord, I believe,

24  is not graduated from high school.

25  Q.    And based on your investigation, approximately when did

1    they begin engaging in exchanging bitcoin?

2    A.    In 2013.

3    Q.    And what did they exchange bitcoin for?

4    A.    They exchanged bitcoin for currency that was deposited

5    into several bank accounts.  They also exchanged it for -- in

6    credit card transactions.

7    Q.    Their business of exchanging currency and other forms of

8    value for bitcoin, is that governed by the money transmission

9    laws?

10   A.    Yes.  Back in March 8 -- or March of 2013, FinCEN, the

11   Financial Crimes Enforcement Network, issued guidance that

12   requires administrators or exchangers of virtual currency to be

13   registered as a money service business.

14   Q.    And is there also a requirement to be licensed by the

15   state in which they operate?

16   A.    Yes.  The State of Louisiana requires any money service

17   business, check cashers to be licensed.

18   Q.    Where did the defendants operate their bitcoin exchange

19   business?

20   A.    The bitcoin exchange business was operated in Shreveport,

21   Louisiana.

22   Q.    And what specific locations?

23   A.    We have evidence of three locations.  They did some

24   transactions at a restaurant in Shreveport, then they also did

25   them at the residence on Winding Ridge in Shreveport, and then

1    we have evidence of transactions taken place at 7700 Jewella

2    Avenue in Shreveport, Louisiana.

3    Q.    What is the connection of 7700 Jewella Avenue to the

4    defendants?

5    A.    Well --

6    Q.    Who owns it?

7    A.    7700 is owned by Randall Lord.

8    Q.    Okay.  And how did they advertise their services?

9    A.    They advertised their services on a website called

10   localbitcoins.com.

11   Q.    Now, the advertisement for their services, was that

12   associated with any particular company name of the businesses

13   we just described?

14   A.    No.  Their advertisement was under a -- advertised under

15   a user name of "Internet151."

16   Q.    But it wasn't affiliated with Quantum Health, Pelican

17   Mining, Data Security, in terms of the actual name on the

18   website?

19   A.    No.

20   Q.    So the FinCEN regulation was passed in March of 2013?

21   A.    Yes.

22   Q.    And made applicable to bitcoin exchangers?

23   A.    That's correct.

24   Q.    And did the defendants become registered with FinCEN at

25   that time?

1   A.   At the time that the guidance was issued?

2   Q.   Correct.

3   A.   No, they did not.

4   Q.   And did they have a license with the State of Louisiana

5   at that time?

6   A.   No, they did not.

7   Q.   Can you explain to the Court Coinbase and how that

8   company is affiliated with the defendants' operation of their

9   MSB.

10  A.   Coinbase is a third-party exchanger or broker of

11  bitcoins.

12  Q.   And did the defendants use Coinbase?

13  A.   Yes, they did.

14  Q.   In connection with their bitcoin exchange business?

15  A.   That's correct.

16  Q.   And did there come a time where they were in

17  communication with Coinbase regarding their registration with

18  FinCEN?

19  A.   Yes.  Around June -- anywhere from spring to June 2014,

20  Coinbase had corresponded with Randall and Michael, both, about

21  them being a registered money service business.

22  Q.   And according to the communications between Coinbase and

23  the defendants, did the company Coinbase point specifically to

24  the volume of activity that they had going in and out of their

25  bank account?

1  A.    That's correct.  They said with the volume and the

2  transactions going in and out of their two Coinbase accounts,

3  it appeared that they were actually operating as a money

4  service business or a broker or exchanger themselves.

5  Q.    Were they asked directly whether or not they were

6  registered with FinCEN by Coinbase?

7  A.    Yes, they were.

8  Q.    And what response did they give?

9  A.    They told Coinbase that they were registered.

10  Q.    And were they in fact registered at that time, in July of

11  2014?

12  A.    No, they were not.

13  Q.    Ultimately, did they become registered with FinCEN?

14  A.    Yes, they did.

15  Q.    And when did that occur?

16  A.    November of 2014.

17  Q.    And at that point, approximately how much money had been

18  processed through their bank accounts in connection with the

19  exchange of money for bitcoin?

20  A.    Approximately $2.5 million.

21  Q.    At the time that they were registered with FinCEN, did

22  they also obtain a license from the State of Louisiana?

23  A.    No, they did not.

24  Q.    Where were the customers located?

25  A.    Their customers were located all around the United

1    States.

2    Q.    And how would they make -- how would they conduct

3    business with those customers if they were all across the

4    country?

5    A.    Generally, the customers would deposit currency or money

6    orders into the various accounts of Michael and Randall Lord.

7    Q.    Can you give the Court an example of some of the places

8    where they banked.

9    A.    One of the places they banked was Wells Fargo.  They also

10   had accounts at JPMorgan Chase.  They had accounts at Bank of

11   Internet.  They had accounts at --

12   Q.    Regions Bank?

13   A.    -- Regions Bank, Capital One.

14   Q.    When they started operating their bitcoin business, were

15   they using commercial accounts or personal accounts?

16   A.    When they first started operating, they were utilizing

17   their personal accounts.

18   Q.    And at some point did that change?

19   A.    Then, yes, at some point they started opening up accounts

20   in the names of these various businesses.

21   Q.    Were they able to maintain their banking relationships

22   across time?

23   A.    No.  They were -- continually had their accounts closed

24   down by the banks.

25   Q.    And can you tell the Court a little bit about that, why

1    that took place.

2    A.    Well, I'm not sure what . . .

3    Q.    Were there applications submitted to the banks in

4    connection with them creating business relationships or account

5    relationships with the banks and financial institutions?

6    A.    Yes.

7    Q.    And how did they describe, for example, Quantum Health?

8    What type of business did they say it was?

9    A.    Quantum Health was described as a medical services

10   company.

11   Q.    And there were accounts used in connection with bitcoin

12   exchange that were titled "Jewella Chiropractic Clinic";

13   correct?

14   A.    Correct.

15   Q.    And there is in fact a Jewella Chiropractic Clinic?

16   A.    Yes, there is a Jewella Chiropractic, but it's currently

17   operated by a Dr. Levin.

18   Q.    And that's in the building that Randall Lord owns?

19   A.    That's correct.  It used to actually be Randall Lord's

20   clinic.

21   Q.    When he practiced as a chiropractor?

22   A.    Correct.

23   Q.    But the transactions associated with the bank account

24   "Jewella Chiropractic" were actually bitcoin exchanges?

25   A.    That's correct.  And they were closed down by the banks

1  because their activity was not commiserate with the -- with the
2  application of the bank account or the business described
3  within the application.
4  Q.    Agent Heusel, the indictment regarding Count 1 describes
5  a couple of overt acts.  Could you explain for the Court how
6  the evidence establishes that these transactions were related
7  to the bitcoin business involving third parties as opposed to
8  personal transactions for the defendants.
9  A.    Well, for example, on or about April 11, 2014, there was
10  a deposit made into an account of Michael Lord's at Wells Fargo
11  Bank, and at that time $5,500 in cash was deposited; and then
12  shortly thereafter, a transaction for $5,499.99 was initiated
13  with Coinbase for the purchase of virtual currency or bitcoins.
14  Q.    Where --
15  A.    And --
16  Q.    I apologize.  Please continue.
17  A.    The transaction -- the purchase was for 12.852 bitcoins.
18         THE COURT:  And was that through this company broker
19  called "Coinbase"?
20         THE WITNESS:  That's correct.
21         THE COURT:  Okay.  I'm just trying to stay on track
22  here.  This is certainly new to the Court.
23         MS. JERNIGAN:  I understand, Your Honor.
24  BY MS. JERNIGAN:
25  Q.    And the customer that made that deposit, was that

1    customer located in Louisiana?

2    A.    No, they were not.

3    Q.    How do you know that?

4    A.    Based upon bank surveillance cameras.

5    Q.    And what did they show?

6    A.    They showed that the deposit was made at a branch outside

7    Louisiana.

8    Q.    Followed shortly thereafter, an amount, except for one

9    penny's difference, with an exchange to Coinbase?

10   A.    Yes.  It was based upon a wire transfer to Coinbase for

11   that amount.  And then Coinbase records revealed that that

12   amount of money was for the purchase of 12.852 bitcoins.

13   Q.    And that was in an account in the name of Michael Lord or

14   for Michael Lord's control and benefit?

15   A.    Yes.  That was the transaction at Coinbase in Michael

16   Lord's wallet.

17   Q.    Would the Lords sell their own bitcoin or buy new bitcoin

18   in exchange for the currency or money packs provided by the

19   customers?

20   A.    Generally, he would sell coins from his wallet and then

21   take that money to replenish his wallet, less his fee.

22   Q.    Were there undercover investigations done as a part of

23   the investigation involving the businesses operated by Michael

24   Lord and Randall Lord?

25   A.    Yes, there was.

1   Q.     And did those take place beginning in the fall of 2014?

2   A.     That's correct.

3   Q.     Was contact initiated with the Lords through their

4   advertisements on the localbitcoins website?

5   A.     That's correct.

6   Q.     And did both the Lords show up to subsequent face-to-face

7   meetings?

8   A.     Yes, both Lords were at each face-to-face transaction.

9   Q.     And the transactions are described in subsequent counts

10  in the indictment.  Can you explain the role that Randall Lord

11  served during those face-to-face meetings in February and the

12  role that Michael Lord served in those face-to-face meetings in

13  February of 2015.

14  A.     Generally, Michael was the one that was transacting the

15  bitcoins through the phones and Randall was the one that would

16  accept the currency and count the currency.

17  Q.     And one of those transactions, one of the two

18  transactions over $10,000, involved $14,000, and the second

19  involved $19,000?

20  A.     That's correct.

21  Q.     So Randall Lord was counting out the currency in the

22  public restaurant while Michael Lord was using the electronic

23  device to conduct the transaction?

24  A.     Correct.

25  Q.     Approximately how many different bank accounts did the

1    Lords use in connection with the operation of their bitcoin

2    business?

3    A.    Bank accounts or banks?

4    Q.    Either.  Whichever one.

5    A.    Oh.  I would say there was probably, in total, anywhere

6    from 25 to 27 different bank accounts utilized.

7    Q.    In connection with their acceptance of either currency,

8    money orders, money packs from their customers, did they ever

9    request identification?

10   A.    No, they did not.

11   Q.    Are any of the requirements that they are subject to

12   under the anti-money laundering laws?

13   A.    Yes.

14   Q.    Yes?  I'm sorry.  "Yes" what?

15   A.    Yes, they are required by -- under anti-money laundering

16   laws to receive identification for certain transactions over, I

17   believe, $3,000.

18   Q.    And based on your review of their transactions, did they

19   do that on a routine and regular basis?

20   A.    No, they did not.

21   Q.    Was Michael Lord interviewed in connection with this

22   investigation?

23   A.    Yes, he was.

24   Q.    And where did that interview take place?

25   A.    At the residence of -- owned by Randall Lord.

1    Q.    The Winding Ridge residence?

2    A.    Winding Ridge in Shreveport, Louisiana.

3    Q.    And what did he say about the bitcoin business when

4    questioned?

5    A.    He said that he was -- he operated as a bitcoin

6    exchanger.  He actually referred to his business being "Crypto

7    Processing Solutions."  And then he kind of would just operate

8    as the exchanger, and his dad was responsible for setting up

9    the accounts and the credit cards or merchant accounts with the

10   credit card companies and that sort of thing.

11           THE COURT:  Are both part of this component of being

12   a broker?

13           THE WITNESS:  Yes.

14           THE COURT:  Or a money service business?

15           THE WITNESS:  Yes.  They had to set up the bank

16   accounts in order to accept the currency and deposits, money

17   orders from around the country.  And they also had to set up

18   the credit card -- set up as a merchant to accept credit card

19   numbers.

20           THE COURT:  Both are necessary, then, to the

21   operation of this money service business?

22           THE WITNESS:  Correct.  They would advertise on the

23   website localbitcoins that they accepted currency for bitcoins

24   and they also accepted credit cards, gift cards, prepaid cards

25   for -- in exchange for bitcoin.

1         THE COURT:  All right.  Thank you.

2         And the two transactions that were mentioned, one for

3    19,000, the other for 14,000, no identification was provided?

4         THE WITNESS:  No.

5         THE COURT:  And that's in connection with the

6    anti-money laundering law requiring a positive ID for

7    transactions over $3,000?

8         THE WITNESS:  Well, there's separate -- there's

9    separate regulations.  One of them is for MSBs.  If they accept

10   a certain amount, then they just have to receive

11   identification.  There is also the requirement if they receive

12   more than $10,000 in one transaction, that they have to file a

13   currency transaction report with --

14        THE COURT:  And that's in cash or by check?

15        THE WITNESS:  Cash or cashier's check.  Not actual

16   check, paper check, but cashier's check and money orders, yes.

17        THE COURT:  That's my understanding.  I wanted that

18   to be clarified.

19        THE WITNESS:  Yes.

20        THE COURT:  All right.  I understand that.

21        THE WITNESS:  Not a bank check, but a money order

22   or -- yes.

23        THE COURT:  Okay.

24   BY MS. JERNIGAN:

25   Q.   And what time frame do they have to file the currency

1   transaction reports after receiving over $10,000 in one or two

2   or more related transactions?

3   A.    15 days.

4   Q.    And did they file any such reports in connection with

5   receipt of the $14,000?

6   A.    No, they did not.

7   Q.    Did they file any such reports in connection with receipt

8   of the $19,000?

9   A.    No, they did knot.

10              MS. JERNIGAN:  I tender the witness, Your Honor.

11              THE COURT:  Any questions, Mr. Carmouche?

12              MR. CARMOUCHE:  Just a couple just to clarify.

13                        CROSS-EXAMINATION

14  BY MR. CARMOUCHE:

15  Q.    The information that you gathered, Agent, was the $19,000

16  and the $14,000.  Were there other transactions that you-all

17  detected that were over the $10,000, or were those the only

18  ones?

19  A.    Those were the only transactions that were identified

20  above $10,000.

21  Q.    And those transactions were actually instituted by your

22  agents, I guess?

23  A.    Yes.  They were part of an undercover operation.

24              MR. CARMOUCHE:  That's all we have.

25              THE COURT:  All right.  Any follow-up on that,

1    Ms. Jernigan?

2         While you're doing that, let me ask one question.

3         The fact that they finally obtained the federal

4    registration in November of 2014, was that made retroactive to

5    encompass transactions occurring before that time?

6              THE WITNESS:  No, it was not.

7              THE COURT:  All right.  Thank you.

8                        REDIRECT EXAMINATION

9    BY MS. JERNIGAN:

10   Q.   Agent Heusel, are you sure that there weren't prior

11   transactions -- let me back up.

12        The defendants met with an undercover agent in the

13   face-to-face transactions that are the basis for the failure to

14   file counts in the indictment; correct?

15   A.   Correct.

16   Q.   And what representations did the defendants make about

17   whether or not they had made other transactions over $10,000?

18   A.   What?  I don't --

19   Q.   What did the defendants say about whether or not they had

20   previously done or accepted currency over $10,000 before,

21   outside of the deals with the undercover agent?

22   A.   Did they make representations to the undercover agent

23   that they had actually done transactions over?

24   Q.   That's the question, yes.

25   A.   I'm not sure about that.

1      MS. JERNIGAN:  No further questions, Your Honor.

2      THE COURT:  Mr. Carmouche, any follow-up?  A little

3  odd, but . . .

4      MR. CARMOUCHE:  No questions, Your Honor.

5      THE COURT:  All right, sir.  You may step down.

6  Thank you.

7      MS. JERNIGAN:  The Government calls Agent Upchurch.

8      (Witness sworn.)

9                    DIRECT EXAMINATION

10  BY MS. JERNIGAN:

11  Q.    Good afternoon.  Please state your name for the record.

12  A.    Richard Brian Upchurch.

13  Q.    And how are you currently employed?

14  A.    With Homeland Security Investigations.

15  Q.    Are you familiar with the investigation involving the

16  defendant, Michael Lord, and the reports regarding the same?

17  A.    Yes.

18  Q.    And Count 15 of the indictment charges Michael Lord with

19  being involved in a drug conspiracy.  How did you first become

20  aware of the drug conspiracy that is the basis for Count 15 in

21  this case?

22  A.    I became involved in the investigation in May of 2015.

23  The United States Customs and Border Protection intercepted in

24  San Francisco -- the mail center intercepted a package that was

25  being shipped from China that contained approximately

1    1 kilogram of 5F-AB-PINACA.

2            THE COURT:  Spell PINACA.

3            THE WITNESS:  P-I-N-A-C-A.

4    BY MS. JERNIGAN:

5    Q.    And, Agent Upchurch, is that a synthetic cannabinoid?

6    A.    Yes.

7    Q.    You said it was approximately a kilogram?

8    A.    Yes.

9    Q.    And the package came in from China?

10   A.    Correct.

11   Q.    Where was it destined for?

12   A.    Springhill, Louisiana; 711 Seventh Street in Springhill,

13   Louisiana.

14   Q.    And once the Department of Homeland Security, Customs

15   area, determined through testing that that was a synthetic

16   drug, what investigative steps took place after that?

17   A.    On May 18, we conducted a controlled delivery of that

18   package to 711 Seventh Street in Springhill, which ultimately

19   resulted in the arrest of Al Hasnat Laghari.

20   Q.    Al Hasnat Laghari was a friend and/or associate of

21   Michael Lord?

22   A.    Correct.

23   Q.    And was he interviewed in connection with the

24   investigation?

25   A.    Yes.

| | |
|---|---|
| 1 | Q.    What did he say about how he knew Michael Lord? |
| 2 | A.    He said he had met Michael Lord on a website known as -- |
| 3 | or localbitcoins.com, and that he would purchase -- he started |
| 4 | purchasing bitcoins from Michael through localbitcoins.com. |
| 5 | Over time, Laghari said, you know, between the two of them, the |
| 6 | trust increased with -- between both of them and they began to |
| 7 | discuss other business endeavors. |
| 8 | Q.    Now, Michael Lord's exchange or sale of bitcoins was his |
| 9 | only source of supporting himself?  That's what he did for a |
| 10 | living; correct? |
| 11 | A.    Correct. |
| 12 | Q.    And, ultimately, did Mr. Laghari and Michael Lord take |
| 13 | steps in furtherance of their desire to get involved in other |
| 14 | activity? |
| 15 | A.    Yeah.  They had discussed -- or Laghari stated in his |
| 16 | interview that they had discussed they were going -- they |
| 17 | wanted to start a Xanax distribution business, and they were |
| 18 | going to use the darknet website Agora to set that business up. |
| 19 | Q.    Okay.  Did they purchase any or obtain any other pieces |
| 20 | of equipment in connection with their desire to have a Xanax |
| 21 | business? |
| 22 | A.    Yes.  On that same day, the 18th of May, 2015, the day Al |
| 23 | Hasnat was arrested, we also seized -- discovered a pill press |
| 24 | in Arkansas at what turned out to be Al Hasnat Laghari's |
| 25 | father's business in Arkansas. |

```
1    Q.    Okay.  So Al Hasnat Laghari's father owns a commercial
2    business just across the state line in Arkansas?
3    A.    Correct.
4    Q.    And that is where you located what?
5    A.    The pill press.
6    Q.    Were photographs taken of that pill press?
7    A.    Yes, they were.
8              MS. JERNIGAN:  Permission to approach the witness,
9    Your Honor?
10             THE COURT:  You may.
11   BY MS. JERNIGAN:
12   Q.    Agent Upchurch, I've handed you what's been marked for
13   identification as Government Exhibits A, B, and C.  Could you
14   identify each for the record, please, and what's contained in
15   them.
16   A.    Yes.  Exhibit A is just a -- is a shot of just the whole
17   setup with the pill press, the mixer, just some product that
18   was just around.  Some of it was already -- had already been
19   pressed, and the rest -- some -- a lot of it was just product
20   that hadn't been, you know, put through the pill press.
21   Q.    Okay.  So Government Exhibit A --
22   A.    Not finished.
23   Q.    -- is a photograph of both the press and the mixer?
24   A.    Correct.
25   Q.    And Government Exhibit B, is that a close-up of the
```

1    mixer?

2    A.    Yes.

3    Q.    And the --

4    A.    No.  That's going to be a close-up of the press.

5    Q.    I beg your pardon.  Of the press.

6          And Government Exhibit C is a close-up of?

7    A.    The mixer.

8          MS. JERNIGAN:  Your Honor, the Government would move

9    to admit Exhibits A, B, and C into evidence.

10         MR. CARMOUCHE:  We have no objection, Your Honor.

11         THE COURT:  All right.  That's received in evidence.

12   BY MS. JERNIGAN:

13   Q.    Agent Upchurch, focussing on Government Exhibit B, again,

14   for the record, what is that a photograph of?

15   A.    A close-up of the pill press.

16   Q.    And the white powder and residue that's contained in the

17   photograph both in the center and to the right in the

18   Tupperware container without a lid, what is that?

19   A.    That was material, product, that was -- that they were

20   using.  It was tested on -- it was verified by the lab on 9/17

21   of 2015 to contain alprazolam.

22   Q.    And then directing your attention to Government

23   Exhibit C, what is that a close-up of in that photograph?

24   A.    The mixer.

25   Q.    And the white cellophane bag on top of the mixer contains

1   what?

2   A.    Just the same product, just -- it was also -- all -- all

3   that was taken and all -- portions of each one of those was

4   sent to a lab, the north criminal -- Louisiana criminalistics

5   laboratory.

6   Q.    For testing?

7   A.    Yes.

8   Q.    And going back to Government Exhibit A, the big white bag

9   on the floor in that photograph next to the yellow box, what

10  did that contain?

11  A.    Binder.  Just a binding agent that's used -- it's mixed

12  with the active ingredient, and it's just a, I guess the

13  connective.  It holds it together, the binding agent.

14          THE COURT:  And "alprazolam" is the generic term for

15  Xanax?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  All right.

18          THE WITNESS:  Yes.

19  BY MS. JERNIGAN:

20  Q.    Did Laghari have, essentially, monitored communications

21  during the course of his cooperation with law enforcement in

22  May of 2015?

23  A.    Yes.

24  Q.    And can you give the Court some examples of the types of

25  communications.  What programs were used to communicate between

1   Laghari and Michael Lord?

2   A.    They used programs that were encrypted.  One of them was

3   entitled "Pidgin."  They used an application called "Signal

4   Private App," and it just -- they're instant messaging

5   applications that offer end-to-end encryption; so they're hard

6   to trace.

7   Q.    That was going to be my question.

8         So when the defendant would communicate with Laghari

9   regarding the drug conspiracy, the encrypted communications

10  means that those are untraceable and hard to track by law

11  enforcement?

12  A.    Correct.

13  Q.    And did he also use SwissJabber during the connection --

14  in connection with his surveilled communications with Michael

15  Lord in May of 2015?

16  A.    Yes, I believe so.

17  Q.    And did Michael Lord corroborate -- did Michael Lord's

18  communications with Al Hasnat Laghari corroborate what Laghari

19  was relating to law enforcement regarding Michael Lord's

20  involvement in drug conspiracy?

21  A.    Yes.

22  Q.    What did they discuss regarding the location of the pill

23  press?

24  A.    They wanted to -- to move it.  They needed to move it.

25  They discussed options of what they could do, where they could

1    move it.

2    Q.    And did they consider and discuss locating it at 7700

3    Jewella Avenue in Shreveport?

4    A.    They did discuss moving it to the chiropractic business

5    on Jewella.

6    Q.    Okay.  Ultimately, did they have a face-to-face meeting?

7    A.    Yes.

8    Q.    And when I say "they," I'm referring to Laghari and

9    Michael Lord.

10   A.    Yes.  On May 20 of 2015.

11   Q.    And again did Michael Lord engage in communications with

12   Laghari about the pill press and their drug conspiracy?

13   A.    Yes.

14   Q.    Agent Upchurch, could you describe for the Court the

15   evidence you gathered that related to actual distribution of

16   drugs by Michael Lord.

17   A.    Well, the pill press.  We also intercepted a package on

18   May 21 of 2015 addressed to Abdula Laghari that went to 15004

19   Highway 371 in South Taylor, Arkansas.  Also intercepted was a

20   Xanax die.  It's a metal part.  It was intercepted on June 16

21   of 2015.

22   Q.    Okay.  Those are -- there were subsequent packages

23   besides the first one that you described for the Court that

24   were intercepted in connection with this drug conspiracy;

25   correct?

1    A.    (No response.)

2    Q.    There was the first package that was intercepted in San

3    Francisco that contained the 1 kilogram of the 5-AB-PINACA;

4    correct?

5    A.    Correct.

6    Q.    And then there were two subsequent packages that were

7    seized by law enforcement in connection with this drug

8    conspiracy investigation; correct?

9    A.    Correct.  The out powder and the Xanax die.

10   Q.    One contained the out powder and one contained the die?

11   A.    Correct.

12   Q.    As it relates to distribution, can you explain to the

13   Court the -- in summary form -- witnesses you interviewed that

14   discussed their observations regarding Michael Lord's role in

15   the distribution of Xanax.

16   A.    Yes.  We interviewed a total of five people.  On

17   November 4, I interviewed Michelle Duhe'.

18   Q.    Duhe'?

19   A.    Correct.

20   Q.    D-u-h-e, apostrophe on the E, I believe?

21   A.    Yeah.

22   Q.    Okay.

23   A.    Aline Migues, A-l-i-n-e, M-i-g-u-e-s; and Brandon Miller,

24   B-r-a-n-d-o-n, Miller, M-i-l-l-e-r.

25   Q.    And also Zach Bajat?

1  A.    Yes.  On November 5, it was -- I interviewed Zach Bajat.

2  Bajat, B-a-j-a-t, is the last name.

3  Q.    And for the most part, those are students of Louisiana

4  State University in Baton Rouge?

5  A.    Correct.

6  Q.    And, in fact, Michelle Duhe' is the girlfriend of -- or

7  was the girlfriend of Laghari?

8  A.    Correct.

9  Q.    And can you explain to the Court what activities they

10  took in and around late May of 2015 regarding approximately

11  10,000 Xanax pills.

12  A.    Michelle Duhe' said she received a call on the 18th, the

13  day Laghari was arrested, and he was saying, "Hey, I'm going to

14  go to jail, but I've got these pills, you know; I need to get

15  them to Baton Rouge."

16       So she further stated that she told her roommate, Aline,

17  what was going on about, you know, the phone call that she

18  received from Al Hasnat, her boyfriend.

19       And Michelle, in her interview, stated that she had a

20  friend in Lafayette by the name of Zach Bajat that would take

21  the pills.

22       So going back to Michelle's interview, she stated that

23  Michael Lord started messaging her, text messaging her, saying,

24  "Hey, I'm here in Baton Rouge."  And then they met.

25  Q.    And did the students proceed to take various steps to try

1    to sell the --

2    A.    Yes.

3    Q.    -- what they described as approximately 10,000 Xanax

4    pills?

5    A.    Yes.

6    Q.    And the goal was to sell the pills to raise bail money

7    for Laghari?

8    A.    Correct.

9    Q.    And in the course of that evening's activities and in the

10   subsequent days, who physically received the pills from Michael

11   Lord?

12   A.    Zachary Bajat.

13   Q.    And that was based on his interview with you?

14   A.    Yes.

15   Q.    He told you that?

16   A.    And he was able to ID Michael Lord out of a six-person

17   photo lineup.

18   Q.    And did Michelle Duhe' also describe using encrypted

19   communications in connection with the brief communication she

20   had with Michael Lord?

21   A.    She said that Al had -- or Al Hasnat Laghari had started

22   to kind of show her -- so, yes, you know, the -- how it worked

23   and whatnot.

24   Q.    Ultimately, did you interview Michael Lord following

25   these activities, investigative activities, in May of 2015?

1    A.    Yes.  On July 9, 2015.

2    Q.    And that was also at the residence in Shreveport?

3    A.    Yes, the Winding Ridge.

4    Q.    And what did he say about his knowledge involving a drug

5    conspiracy?

6    A.    He stated that he was -- he had nothing to do with

7    narcotics.  He said he was a bitcoin dealer.

8              MS. JERNIGAN:  I tender the witness, Your Honor.

9              THE COURT:  Any questions, Mr. Carmouche?

10             MR. CARMOUCHE:  Just a few, kind of clarify.

11                         CROSS-EXAMINATION

12   BY MR. CARMOUCHE:

13   Q.    The man in Arkansas, his name is?  I mean, that the

14   package was delivered to originally.

15   A.    Al Hasnat Laghari.

16   Q.    Al?

17   A.    A-l, H-a-s-n-a-t, and the last name is L-a-g-h-a-r-i.

18   Q.    And when he was arrested, did he immediately start

19   cooperating or working with the agents?

20   A.    Yes.

21   Q.    And up to that point, did you have any information or

22   evidence on Michael Lord?

23   A.    No, not till -- not until the interview of Mr. Laghari.

24   Q.    And y'all did a recorded, I think, phone conversation

25   between Laghari and Michael when he --

```
1    A.    Correct.
2    Q.    -- called?
3    A.    That was on May 20, 2015.
4    Q.    So did -- other than that phone conversation, did -- was
5    Michael ever placed in possession of those -- that Xanax, the
6    drugs?
7    A.    The approximately 10,000 pills in Baton Rouge, yes.  He
8    was ID'd by Zachary Bajat as giving him pills.
9    Q.    So do you know how he came into possession of those
10   pills?  Did Laghari bring them, take them to him?
11   A.    I don't know.  I don't know.
12             MR. CARMOUCHE:  I have nothing further, Your Honor.
13             THE COURT:  One quick question.  In this particular
14   instance, Count 15 has to do with the drug conspiracy for the
15   alprazolam, and the cannabinoid synthetic simply is --
16             MS. JERNIGAN:  Relevant conduct.
17             THE COURT:  -- relevant conduct?
18             MS. JERNIGAN:  Correct.
19             THE COURT:  All right.  I wanted to make that clear
20   in my own mind.  Thank you.
21        All right, sir.  You may step down.  Thanks.
22        All right.  Mr. Carmouche, as he clears the witness
23   stand, would you bring your clients back up.
24        Let's start with you, Mr. Randall Lord.  Did you listen
25   to --
```

1        Is it Mr. Hisal (phonetic)?

2            AGENT HEUSEL:  Yes, sir.

3            THE COURT:  All right.  I want to make sure I

4    pronounce your last name correctly.

5        Did you listen to his testimony?

6            DEFENDANT RANDALL LORD:  I did.

7            THE COURT:  Do you have any substantial disagreement

8    with it?

9            DEFENDANT RANDALL LORD:  No, I do not.

10           THE COURT:  Mr. Michael Lord, with respect to the

11   bitcoin involvement in Count 1, did you listen to his testimony

12   as well?

13           DEFENDANT MICHAEL LORD:  Yes, sir.

14           THE COURT:  Do you have any substantial disagreement

15   with it?

16           DEFENDANT MICHAEL LORD:  No, sir.

17           THE COURT:  All right.  Mr. Michael Lord, with

18   respect to the agent's testimony of Richard Upchurch with

19   respect to the alprazolam, did you listen to his testimony as

20   well?

21           DEFENDANT MICHAEL LORD:  Yes, sir.

22           THE COURT:  Do you have any substantial disagreement

23   with that?

24           DEFENDANT MICHAEL LORD:  No, sir.

25           THE COURT:  All right.  The Court will accept the

1  testimony of the two witnesses as the necessary factual

2  predicate for the entry of the guilty pleas to all counts by --

3  or the counts involved by these individuals.

4      I need to get some information from each of you.

5      Mr. Randall Lord, how old are you?

6      DEFENDANT RANDALL LORD:  58.

7      THE COURT:  And, Michael Lord, how old?

8      DEFENDANT MICHAEL LORD:  29.

9      THE COURT:  And, Randall Lord, how many years of

10  education did you complete?

11      DEFENDANT RANDALL LORD:  I have a degree in

12  chiropractic; so that's a professional degree that's four years

13  beyond college, a bachelor's degree.

14      THE COURT:  All right.  And, Mr. Michael Lord, I

15  understood from earlier testimony that you did not graduate

16  high school?

17      DEFENDANT MICHAEL LORD:  I got my GED.

18      THE COURT:  All right.  When did you get your GED?

19      DEFENDANT MICHAEL LORD:  It's been a long -- it was a

20  long time ago.  I don't recall exactly.

21      THE COURT:  All right.  And what high school did you

22  attend?

23      DEFENDANT MICHAEL LORD:  Captain Shreve.

24      THE COURT:  And at what age did you leave Shreve?

25      DEFENDANT MICHAEL LORD:  I think I was 15.

1          THE COURT:  18?

2          DEFENDANT MICHAEL LORD:  I think I was 15.

3          THE COURT:  15.  All right.

4      In this instance, are either of you under the care of a

5  physician for any reason?  Mr. Randall Lord?

6          DEFENDANT RANDALL LORD:  I am.

7          THE COURT:  For what?

8          DEFENDANT RANDALL LORD:  High blood pressure.

9          THE COURT:  And any other malady or affliction?

10          DEFENDANT RANDALL LORD:  No, sir.

11          THE COURT:  And, Mr. Michael Lord, are you under the

12  care of a doctor?

13          DEFENDANT MICHAEL LORD:  No.

14          THE COURT:  Mr. Randall Lord, does that medication

15  for high blood pressure make you sleepy or groggy?

16          DEFENDANT RANDALL LORD:  No, it does not.

17          THE COURT:  Are you clearheaded as you stand in front

18  of me today?

19          DEFENDANT RANDALL LORD:  I am.

20          THE COURT:  Mr. Michael Lord, are you clearheaded as

21  you stand in front of me today?

22          DEFENDANT MICHAEL LORD:  Yes, sir.

23          THE COURT:  Both of you are out on bond.  In the past

24  24 hours, have you taken any drugs, medicine or pills, or

25  consumed anything with an alcohol content at all?  Mr. Randall

1   Lord?

2           DEFENDANT RANDALL LORD:  I take my daily prescription

3   for my blood pressure medication.  Other than that, no.

4           THE COURT:  Mr. Michael Lord?

5           DEFENDANT MICHAEL LORD:  I took caffeine today.

6           THE COURT:  All right.  In the morning?

7           DEFENDANT MICHAEL LORD:  Yes.

8           THE COURT:  All right.  Any other?

9           DEFENDANT MICHAEL LORD:  That's it.

10          THE COURT:  All right.  Do either of you have any

11  mental or physical problems that might limit your ability to

12  understand today's court proceeding?  Mr. Randall Lord?

13          DEFENDANT RANDALL LORD:  No, Your Honor.

14          THE COURT:  Mr. Michael Lord?

15          DEFENDANT MICHAEL LORD:  No.

16          THE COURT:  In this instance, Mr. Randall Lord, do

17  you know why you're here and what your role in this proceeding

18  is?

19          DEFENDANT RANDALL LORD:  I do.

20          THE COURT:  Mr. Michael Lord?

21          DEFENDANT MICHAEL LORD:  Yes.

22          THE COURT:  At this time, Mr. Carmouche, with respect

23  to both of your clients, do you have any doubt as to their

24  competence to plead guilty at this time?

25          MR. CARMOUCHE:  None, Your Honor.

```
 1            THE COURT:  Ms. Jernigan?
 2            MS. JERNIGAN:  No, Your Honor.
 3            THE COURT:  The Court finds both defendants competent
 4   to enter guilty pleas in this matter.
 5         Mr. Carmouche has been your attorney of record for the
 6   entire time of this proceeding, sir?
 7            DEFENDANT RANDALL LORD:  Yes, sir, that's correct.
 8            THE COURT:  Mr. Michael Lord as well?
 9            DEFENDANT MICHAEL LORD:  Yes.
10            THE COURT:  And in this instance, we've already gone
11   over the waiver of conflicts and everything that was done at
12   your initial appearance, but have you had enough time to
13   discuss your particular case with him, Mr. Randall Lord?
14            DEFENDANT RANDALL LORD:  I have, Your Honor.
15            THE COURT:  Mr. Michael Lord?
16            DEFENDANT MICHAEL LORD:  Yes.
17            THE COURT:  And are you satisfied with his
18   representation of your interests?
19            DEFENDANT RANDALL LORD:  Yes, sir.
20            DEFENDANT MICHAEL LORD:  Yes, sir.
21            THE COURT:  Have you seen any evidence of any
22   conflict of interest between the two of you and his
23   representation?
24            DEFENDANT RANDALL LORD:  No, Your Honor.
25            DEFENDANT MICHAEL LORD:  No, sir.
```

1         THE COURT:  All right.  Let's talk about your right

2  to a trial by jury.  Both of you have an opportunity to require

3  the Government to proceed to present its evidence against both

4  of you at a jury trial.  Twelve people would be seated over

5  here in the jury box and would listen to evidence that the

6  Government offered against you.  I need to under -- be sure you

7  understand that in the federal system, that it takes all 12

8  jurors to agree unanimously that you were guilty of a crime

9  before you could be convicted of those crimes.  Is that clear,

10  Mr. Randall Lord?

11         DEFENDANT RANDALL LORD:  It is, Your Honor.

12         THE COURT:  Mr. Michael Lord?

13         DEFENDANT MICHAEL LORD:  Yes.

14         THE COURT:  In this instance, you'd come into that

15  trial with a strong legal presumption of innocence.  What that

16  means is you have nothing to prove.  You do not need to prove

17  your innocence.  Is that clear?

18         DEFENDANT RANDALL LORD:  Yes, sir.

19         DEFENDANT MICHAEL LORD:  Yeah.

20         THE COURT:  In this instance, the Government bears

21  the entire burden of proof.  They have to come forward with

22  competent evidence to prove each of you guilty beyond a

23  reasonable doubt of the crimes that they've charged you with.

24  Do you understand that concept, sir?

25         DEFENDANT RANDALL LORD:  I do.

1    DEFENDANT MICHAEL LORD:  Yes, sir.

2    THE COURT:  In this instance, the Government does

3    have certain essential elements that have to be proved.

4    Let's start with the bitcoin -- sorry -- the conspiracy

5    to operate an unlicensed money service business under Title 18,

6    U.S. Code, Section 371.  That section makes it a crime for

7    anyone to conspire with someone else to commit an offense

8    against the laws of the United States.  Here, both of you are

9    charged with conspiring to operate an unlicensed money service

10   business or "MSB."

11   A conspiracy is an agreement between two or more persons

12   to join together to accomplish some unlawful purpose.  It is a

13   kind of partnership in crime in which each member becomes the

14   agent of every other member.

15   Now, if the Government took you to a trial by jury,

16   here's what the Government would have to prove beyond a

17   reasonable doubt and to the satisfaction of all 12 jurors:

18   First, that each of you and at least one other person made an

19   agreement to participate in an unlicensed MSB as charged in the

20   indictment; second, that either or both of you knew of the

21   unlawful purpose of that agreement and joined in it willfully,

22   that is, with the intent to further its unlawful purpose; and,

23   third, that one of the conspirators during the existence of the

24   conspiracy knowingly committed at least one of the overt acts

25   described in the indictment in order to accomplish some object

1    or purpose of the conspiracy.

2        Those are called the "essential elements" of the crime

3    you're charged with.  Do you believe the Government could prove

4    those beyond a reasonable doubt and to the satisfaction of all

5    12 jurors against you, Mr. Randall Lord?

6            DEFENDANT RANDALL LORD:  I do.

7            THE COURT:  Mr. Michael Lord?

8            DEFENDANT MICHAEL LORD:  Yes.

9            THE COURT:  Would you like me to go through the rest

10   of the conspiracy, or would you like to use the short form

11   today?

12           MR. CARMOUCHE:  The short form is fine, Your Honor.

13           THE COURT:  All right.  Short, agreeable with that,

14   Ms. Jernigan?

15           MS. JERNIGAN:  Yes, Your Honor.

16           THE COURT:  Now, in this instance, Mr. Carmouche

17   would exercise certain other constitutional rights that you

18   have that are connected to that trial by jury.  The first one

19   is the right to confront or see and hear each witness that's

20   offered against you.  You saw an example of that earlier today.

21       Right alongside that right is the right to question or

22   cross-examine each witness, testing the accuracy and the extent

23   and the knowledge of the testimony of each witness.

24       The last right that you have is called "compulsory

25   process," which simply means that there is an opportunity for

1  Mr. Carmouche to subpoena virtually anyone from virtually

2  anywhere in order to come to this courthouse to testify to help

3  make out a defense on your behalf.  You understand you have

4  these rights, sir?

5            DEFENDANT RANDALL LORD:  I do.

6            DEFENDANT MICHAEL LORD:  Yes, sir.

7            THE COURT:  In this instance, he could object to

8  questions the government counsel asked.  He could object to

9  tangible evidence sought to be offered.  All those are bound up

10  in that right to proceed to a trial by jury.

11         There's one last one we need to discuss; that is, in

12  connection with the right to remain silent, do you understand

13  that you have a right not to testify at your trial?

14            DEFENDANT RANDALL LORD:  I do.

15            DEFENDANT MICHAEL LORD:  Yes, sir.

16            THE COURT:  You could testify if you so chose, but

17  there is no one that could ever force you to take the witness

18  stand at your trial.  Is that clear, sir?

19            DEFENDANT RANDALL LORD:  It is.

20            DEFENDANT MICHAEL LORD:  Yes.

21            THE COURT:  If I accept your guilty plea at the end

22  of the hearing today, this trial we've been talking about

23  hypothetically will never occur.  Are you aware of that?

24            DEFENDANT RANDALL LORD:  Yes, sir, I am.

25            DEFENDANT MICHAEL LORD:  Yes, sir.

1    THE COURT:  And in approximately 90 days, give or

2  take a few days, I will then sentence you on the basis of your

3  sworn guilty pleas that you have entered in court, under oath,

4  today.  Do you understand that process?

5    DEFENDANT RANDALL LORD:  I do.

6    DEFENDANT MICHAEL LORD:  Yes.

7    THE COURT:  Mr. Michael Lord, you're very quiet.  I

8  want to make sure we hear you.

9    DEFENDANT MICHAEL LORD:  Yes, sir, I understand.

10    THE COURT:  All right.  All these rights that we have

11  been discussing to this point will be given up or waived by

12  you.  Do you understand that?

13    DEFENDANT RANDALL LORD:  I do.

14    DEFENDANT MICHAEL LORD:  Yes.

15    THE COURT:  And are you willing to give up all the

16  rights that we've been discussing for me to continue with this

17  guilty plea hearing, Mr. Randall Lord?

18    DEFENDANT RANDALL LORD:  I am.

19    THE COURT:  Mr. Michael Lord?

20    DEFENDANT MICHAEL LORD:  Yes, sir.

21    THE COURT:  Now, has anyone threatened you in any way

22  to plead guilty?

23    DEFENDANT RANDALL LORD:  No, sir.

24    DEFENDANT MICHAEL LORD:  No, sir.

25    THE COURT:  Has anyone forced you to plead guilty?

1      DEFENDANT RANDALL LORD:  No, sir.

2      DEFENDANT MICHAEL LORD:  No, sir.

3      THE COURT:  Or tricked you into pleading guilty?

4      DEFENDANT MICHAEL LORD:  No.

5      DEFENDANT RANDALL LORD:  No, sir.

6      THE COURT:  Has anyone told you if you do not plead

7  guilty, that additional charges would be brought against you or

8  other adverse action taken against you?

9      DEFENDANT RANDALL LORD:  No, sir.

10      DEFENDANT MICHAEL LORD:  No.

11      THE COURT:  And are you willing to plead guilty

12  because you are in fact guilty as charged in Count 1?

13      DEFENDANT RANDALL LORD:  Yes, sir.

14      DEFENDANT MICHAEL LORD:  Yes, sir.

15      THE COURT:  And is this a free and voluntary act on

16  your part?

17      DEFENDANT RANDALL LORD:  It is.

18      DEFENDANT MICHAEL LORD:  Yes.

19      THE COURT:  And it was done with the advice and

20  consent of your attorney?

21      DEFENDANT RANDALL LORD:  Yes, sir.

22      DEFENDANT MICHAEL LORD:  Yes.

23      THE COURT:  Is that accurate, Mr. Carmouche?

24      MR. CARMOUCHE:  That's correct, Your Honor, yes.

25      THE COURT:  You agree with their decision to plead

1    guilty?

2            MR. CARMOUCHE:  I do.

3            THE COURT:  Now let's go over Count 15, Mr. Michael

4    Lord.

5        Under Count 15, Section 21, of the U.S. Code, Section

6    8 -- I'm sorry.  Title 21, U.S. Code, Section 846 makes it a

7    crime for anyone to conspire with someone else to commit a

8    violation of certain controlled substances laws of the United

9    States.

10        Here, Mr. Michael Lord, you're charged with conspiring

11   and agreeing together to distribute and to possess with the

12   intent to distribute controlled dangerous substances, to

13   include alprazolam, a Schedule IV controlled substance.  Do you

14   understand that, sir?

15           DEFENDANT MICHAEL LORD:  Yes, sir.

16           THE COURT:  Now, a conspiracy, we went over this a

17   little bit before, but its context is a little bit different.

18   A conspiracy is an agreement by two or more persons to commit

19   an unlawful act.  It is a kind of partnership in crime for

20   criminal purposes.  Every member of the conspiracy becomes the

21   agent or partner of every other member.

22        Now, if you went to this trial by jury that we discussed,

23   in order to establish that you are guilty of this crime,

24   Mr. Michael Lord, the Government has to prove each of the

25   following beyond a reasonable doubt and to the satisfaction of

1    all 12 jurors:  First, that two or more persons directly or

2    indirectly reached an agreement to knowingly and intentionally

3    conspire and agree together to distribute and to possess with

4    the intent to distribute controlled dangerous substances, to

5    include alprazolam, a Schedule IV controlled substance; second,

6    that you knew of the unlawful purpose of that agreement; and,

7    third, that you joined in that agreement willfully, that is,

8    with the intent to further its unlawful purpose.

9         That's what the Government would have to prove against

10   you from the legal viewpoint if it went to trial on Count 15.

11   Do you understand that?

12              DEFENDANT MICHAEL LORD:  I understand.

13              THE COURT:  Do you believe that the Government could

14   prove each one of those essential elements against you?

15              DEFENDANT MICHAEL LORD:  I do.

16              THE COURT:  Beyond a reasonable doubt?

17              DEFENDANT MICHAEL LORD:  I do.

18              THE COURT:  And to the satisfaction of all 12 jurors?

19              DEFENDANT MICHAEL LORD:  Yes.

20              THE COURT:  In this particular instance, you have the

21   same rights that we discussed to a trial by jury on that count

22   as well.  Do you understand that?

23              DEFENDANT MICHAEL LORD:  I understand.

24              THE COURT:  Do I need to go over all those rights

25   again or --

1        DEFENDANT MICHAEL LORD:  That's not necessary.

2        THE COURT:  All right.  You have an understanding of

3   what rights you have and what you're protected by under the

4   Constitution and laws?

5        DEFENDANT MICHAEL LORD:  I understand.

6        THE COURT:  And the function of your lawyer in

7   exercising some of those rights on your behalf?

8        DEFENDANT MICHAEL LORD:  Yes, sir.

9        THE COURT:  Now, do you claim that your guilty plea

10  to Count 15 was in any way forced or coerced?

11        DEFENDANT MICHAEL LORD:  It wasn't.

12        THE COURT:  Or that anyone conspired to -- I'm sorry,

13  didn't conspire -- did not force you or trick you to plead

14  guilty?

15        DEFENDANT MICHAEL LORD:  Nobody forced me.

16        THE COURT:  All right.  You're willing to plead

17  guilty because you are in fact guilty as charged?

18        DEFENDANT MICHAEL LORD:  Yes.

19        THE COURT:  Mr. Randall Lord --

20        DEFENDANT RANDALL LORD:  Yes, sir.

21        THE COURT:  -- as to Count 1, guilty as charged?

22        DEFENDANT RANDALL LORD:  Yes, sir.

23        THE COURT:  And, Mr. Michael Lord, guilty as charged

24  as to Count 1 as well?

25        DEFENDANT MICHAEL LORD:  Yes.

1    THE COURT:  And, Mr. Michael Lord, are you -- is this
2    a free and voluntary act to plead guilty to Count 15?
3    DEFENDANT MICHAEL LORD:  Yes.
4    THE COURT:  And you've done it after seeking the
5    consent and advice of your counsel?
6    DEFENDANT MICHAEL LORD:  Yes.
7    THE COURT:  Did he agree with your decision to plead
8    guilty?
9    DEFENDANT MICHAEL LORD:  Yes.
10    THE COURT:  Mr. Carmouche, is that accurate?
11    MR. CARMOUCHE:  That is correct, Your Honor, yes.
12    THE COURT:  Both of you have signed something called
13    plea agreements in this particular matter.  I'm going to hand
14    the originals back to you.  Plea agreements set out the terms
15    of the so-called contract with the Government by which each of
16    you agree to certain terms and the Government doesn't have to
17    take you to trial and you don't go to trial on all those
18    counts.
19         In this particular instance, let's start with the plea
20    agreement on Mr. Randall Lord first.  If you would turn to the
21    signature page first, Mr. Carmouche.
22         Mr. Lord, at the back of this document consisting of
23    eight pages, is that your signature at the top, sir?
24    DEFENDANT RANDALL LORD:  At the top?
25    MR. CARMOUCHE:  Let me see.

1           DEFENDANT RANDALL LORD:  I must be on the wrong page.

2           MR. CARMOUCHE:  Is that 8 of 8, Your Honor?

3           THE COURT:  That is correct.

4           DEFENDANT RANDALL LORD:  Oh.  Yes.

5           THE COURT:  Is that your signature, sir?

6           DEFENDANT RANDALL LORD:  Yes, sir, it is.

7           THE COURT:  Did Mr. Carmouche go over this document

8    line by line before you signed it?

9           DEFENDANT RANDALL LORD:  Yes, sir, he did.

10          THE COURT:  Do you have any questions you need to ask

11   me about it?

12          DEFENDANT RANDALL LORD:  I don't believe I do.

13          THE COURT:  All right.  Mr. Carmouche, you signed it

14   on page 7?

15          MR. CARMOUCHE:  That's correct, Your Honor.

16          THE COURT:  Approving it as to form and content as

17   his attorney of record?

18          MR. CARMOUCHE:  Yes, that's correct.

19          THE COURT:  All right.  If you would turn to the plea

20   agreement, then, with respect to Mr. Michael Lord, also an

21   eight-page document.

22          MR. CARMOUCHE:  He has it.

23          THE COURT:  Mr. Michael Lord, is that your signature

24   there towards the top?

25          DEFENDANT MICHAEL LORD:  Yes, sir.

1        THE COURT:  Once again, was this document gone over
2    line by line with your attorney before you signed it?
3        DEFENDANT MICHAEL LORD:  Yes, sir.
4        THE COURT:  Do you have any questions you need to ask
5    me about it?
6        DEFENDANT MICHAEL LORD:  No, sir.
7        THE COURT:  All right.  In this particular instance,
8    let's turn in both plea agreements -- I believe it's going to
9    be to page 3.
10        MR. CARMOUCHE:  Page 3?
11        THE COURT:  Yes.
12        MR. CARMOUCHE:  3 of 8?
13        DEFENDANT RANDALL LORD:  3 of 8?
14        THE COURT:  And it says, paragraph D, "Sentencing."
15        DEFENDANT RANDALL LORD:  Yes, sir.
16        THE COURT:  Did we find that?
17        DEFENDANT RANDALL LORD:  Yes, sir.
18        THE COURT:  Mr. Randall Lord, you're holding your
19    document in front of you?
20        DEFENDANT RANDALL LORD:  I've got it.
21        THE COURT:  This says that Randall B. Lord
22    understands and agrees that the maximum punishment under
23    Count 1 is a term of imprisonment of not more than five years
24    and a fine of not more than $250,000.  You see that?
25        DEFENDANT RANDALL LORD:  I do.

1          THE COURT:  Mr. Michael Lord, the same particular

2    language applies to you to Count 1 as well.  Do you see that?

3          DEFENDANT MICHAEL LORD:  Yes.

4          THE COURT:  Now, you've got an additional count, 15,

5    that says that the maximum punishment on Count 15 is a term of

6    imprisonment of not more than five years and a fine of not more

7    than $250,000.  Do you see that?

8          DEFENDANT MICHAEL LORD:  Yes.

9          THE COURT:  Now, the next paragraph, Mr. Randall

10   Lord, says that you owe $100 as a special assessment, payable

11   at the time of the guilty plea.  You see that requirement?

12         DEFENDANT RANDALL LORD:  I do.

13         THE COURT:  Mr. Michael Lord, you're pleading guilty

14   to two counts; so you have an obligation to pay $200 as a

15   special assessment.  Do you see that?

16         DEFENDANT MICHAEL LORD:  Yes.

17         THE COURT:  In this instance, with respect to

18   Count 1, both of you could receive a term of supervised release

19   of not more than three years on top of any prison time that

20   might be imposed upon you.  Do you understand that?

21         DEFENDANT RANDALL LORD:  I do.

22         DEFENDANT MICHAEL LORD:  Yes.

23         THE COURT:  And supervised release in the federal

24   system means that I'm going to attach terms and conditions to

25   your behavior that's going to restrict your behavior.  It will

1    prohibit some behavior.  It will require you to do certain
2    things at certain times.
3         And as long as you stay in compliance with that
4    supervised release set of conditions that I will impose on each
5    of you, you won't have to worry about seeing me again.  The
6    probation officer notifies me that you're not in compliance
7    with them and you will see me here, very possibly with
8    Mr. Carmouche standing by your side, and I've got to decide
9    whether you're in violation or compliance.
10        Here's the problem:  If I find you to be in violation, I
11   can send you back to a federal correctional facility for the
12   full term of your supervised release, which we know could be up
13   to three years.  Clear enough, Mr. Randall Lord?
14             DEFENDANT RANDALL LORD:  Yes, sir, it is.
15             DEFENDANT MICHAEL LORD:  Yes, sir.
16             THE COURT:  Now, in this instance, as to Count 15,
17   Mr. Michael Lord, you face a supervised release term of at
18   least three years in length, with the same speech; that is, if
19   you're in violation of the terms and conditions that I impose
20   you on that, then you can be sent back to a federal
21   correctional facility.
22        So you've got more risk than your father has because
23   you're pleading guilty to two different counts.  Do you
24   understand that?
25             DEFENDANT MICHAEL LORD:  I understand that.

1    THE COURT:  Now, in this particular instance, is

2  there anything else that requires discussion in open court for

3  either of these plea agreements, Mr. Carmouche?

4    MR. CARMOUCHE:  I don't think so, Your Honor.

5    THE COURT:  Ms. Jernigan, anything you see that needs

6  to be underscored or emphasized?

7    MS. JERNIGAN:  There is forfeiture language in the

8  plea agreements, but it's just generic forfeiture language at

9  this point.

10    THE COURT:  Whatever you had that was involved in the

11  commission of either crime is going to be forfeited to the

12  Government.  And that means all equipment.  It would include

13  websites.

14    Am I correct in that, Ms. Jernigan?

15    MS. JERNIGAN:  Potentially, but I don't think we're

16  going to be forfeiting that.

17    THE COURT:  I understand.  And this is kind of an

18  unusual idea about business names, the seizure of businesses

19  involved in the processing, receipt, exchange and acquisition,

20  the wallets that are electronic in nature that are used in all

21  of this, whether that's subject to seizure or shutdown, however

22  that may be, or forfeited to the Government.  And that's going

23  to be covered in greater detail in the presentence report.

24  Okay?

25    DEFENDANT MICHAEL LORD:  All right.

1     THE COURT:  Do you understand all of that is subject

2     to being lost or forfeited to the Government?

3     DEFENDANT RANDALL LORD:  Yes, sir.

4     DEFENDANT MICHAEL LORD:  Yes, sir.

5     THE COURT:  All right.  If there was hard currency

6     involved, hard currency could also be forfeited to the

7     Government.  What the Government does with bitcoin, I don't

8     have any idea.

9         Does our Homeland Security guy know what the Government

10    does with bitcoin?

11    AGENT UPCHURCH:  (Shakes head.)

12    THE COURT:  How about the IRS CID?

13    AGENT HEUSEL:  Convert it back to hard currency.

14    THE COURT:  Convert it back to hard currency

15    certainly seems like a worthwhile endeavor.  As long as you

16    don't have to pay too much in fees, you can come out ahead.

17        All right.  All of that is subject to forfeiture.  The

18    electronic currency or internet currency known as "bitcoin" is

19    all subject to forfeiture.  Do you understand that, both of

20    you?

21    DEFENDANT RANDALL LORD:  I do.

22    THE COURT:  All right.

23        Does that sufficiently cover the generic language,

24    Ms. Jernigan?

25    MS. JERNIGAN:  I believe so, Your Honor.

1        THE COURT:  All right.

2            Now, in this instance, has anyone made a promise to you

3    that led you to plead guilty, other than what's contained in

4    this Plea Agreement?

5            DEFENDANT RANDALL LORD:  No, Your Honor.

6            DEFENDANT MICHAEL LORD:  No.

7        THE COURT:  All right.  And let's talk about plea

8    negotiations.  Mr. Carmouche, what kind of plea negotiations

9    did we have?  What did the Government offer, first and

10   foremost?

11       MR. CARMOUCHE:  Well, of course, they offered the

12   plea to the one count for Mr. Randall Lord and the two counts

13   for Michael and dismiss all others.  We haven't discussed

14   actual relevant conduct at this point, but --

15       THE COURT:  And that will be the subject of a

16   presentence investigation and report, which is what we're going

17   to get into here very shortly.

18       MR. CARMOUCHE:  Yes, Your Honor.

19       THE COURT:  And pursuant to the Plea Agreement,

20   Ms. Jernigan, remaining counts are to be dismissed, provided

21   everything goes according to plan?

22       MS. JERNIGAN:  Correct, Your Honor, including the

23   submission of the financial statement within two weeks

24   following today's date.  And this was the only plea offer

25   provided by the Government to the defendants.

1    THE COURT:  Fairly typical kind of negotiation

2  involved in this matter:  Here it is, take it or leave it?

3    MR. CARMOUCHE:  Yes, sir.

4    THE COURT:  Okay.  Just a typical approach by the

5  Government.  There's nothing new or exciting or odd about that

6  procedure, but, under the law, I'm required to go through and

7  determine what level of negotiations the Government was willing

8  to engage in in this particular point.

9    Let's talk about your sentencing for just a moment.

10    Have you got that blue, laminated sheet, Mr. Carmouche?

11    That happens to be blue in color.  Mine happens to be

12  yellow.  That's how I know it belongs up here.  That's a

13  sentencing table, and you'll see it's expressed in months of

14  imprisonment.  This is done pursuant to the United States

15  Sentencing Guidelines.

16    What's going to happen at the end of this hearing, if I

17  accept your guilty plea, I will order that a presentence

18  investigation begin into your backgrounds.  It will give me

19  your social history from the time you were born right up

20  through the current time.  It will detail for me any criminal

21  history that you have, and it will do certain calculations.

22    Your crime or crimes, just like all of them in the

23  federal system, have a numeric value assigned to them as a

24  starting point somewhere between 1 and 43, running top to

25  bottom on the left side of that chart.

1       In this instance, you'll also see six Roman numerals left

2    to right at the top.  If you're first-time offenders, you would

3    qualify for Roman numeral I.  If you are not, depending upon

4    your history, you're somewhere between a II and a VI.

5       In this instance, I don't know where you fall on this

6    chart today, and one of the primary reasons for having the

7    presentence report is to correctly calculate what your net

8    offense level is.

9       Let's happen to say that you started at a Level 18 for

10   what I will call the "bitcoin conspiracy," for lack of a better

11   term.  And you'll see the numbers under Category I:  27 dash

12   33.  That represents the number of months that's recommended

13   under the guidelines that I sentence you to as a confinement

14   sentence.

15      They're recommendations only.  I don't have to follow

16   these guidelines.  But the calculations have to be done, and

17   they have to be done correctly.

18      Now, in this instance, Mr. Michael Lord, you have two

19   different kinds of crimes.  One is a drug conspiracy.  The

20   other is the so-called bitcoin conspiracy.  Sometimes different

21   kinds of crimes with similar kinds of sentences can be grouped

22   together in order to arrive at a starting point for the offense

23   level.  It may or may not be an 18.  It can be different.

24      But in either case, whether it's the bitcoin or the drug

25   conspiracy, there are certain things that can take that number

1  and drive it downward towards 41.  Depending on the size of
2  transactions, for instance, it could add a plus 2, plus 3,
3  plus 4, in which case you go from an 18, if it added four, to a
4  22.  You see that 41 dash 51?  That means the calculated
5  offense level would rise and your exposure to time as a
6  confinement sentence would likewise go up.
7       But there are other things that can take points away from
8  that starting point.  And without an enhancement, if we go back
9  to No. 18, we take three points away for your acceptance of
10  responsibility and we end up at a 15, which says 18 to 24
11  months.  Okay?
12       As I've told you before, I don't have enough information
13  in order to be able to sentence you today.  Okay?  This is by
14  way of example, and I have absolutely no idea where you fall on
15  this chart.
16       What will happen is that this investigation will result
17  in a written report.  A copy of the written report, paragraph
18  by paragraph, goes to Ms. Jernigan, Mr. Carmouche, and comes to
19  me.  Mr. Carmouche will go over those reports for each of you
20  and will determine whether he sees factual errors that need
21  correction or perhaps legal conclusion errors that need to be
22  addressed.
23       Many times there are no objections at all.  Other times,
24  the objections that are filed can be worked out between the
25  government's lawyer, your lawyer, and the probation office.  If

1  there are any leftover objections at the time you are

2  sentenced, then it falls to me in order to resolve them.

3  Sometimes they can affect where you fall on this chart.  Okay?

4      Now, the chart's not the only thing that governs how I

5  sentence you.  There's certain other factors called "judge

6  factors" or "statutory factors," and we refer to them in

7  shorthand as "Section 3553(a) factors."  Those factors are not

8  embodied anywhere in the U.S. Sentencing Guidelines and are

9  factors that judges can take into account in determining a

10  reasonable sentence under your set of circumstances, not

11  somebody else's.  And that sentence can be either higher or

12  lower than what is called for under the guidelines.

13      If I sentence you pursuant to Section 3553(a), then it's

14  called a "nonguideline sentence" in this circuit.  Okay?

15      But since I don't know what your sentence is going to be,

16  I'm not even going to hazard a guess as to where you fall on

17  that chart or what particular factors I'm going to use in

18  determining what your ultimate sentence is.

19      I will tell you this:  I'm going to urge you to cooperate

20  with the probation officer in furnishing complete and accurate

21  information to be included in that report.  There's one simple

22  reason for that.  First, the law requires that it be correctly

23  calculated.  But really the biggest reason, the most

24  significant one, is that becomes the single most important

25  document I'm going to use in determining your sentence.  Clear

1  enough?

2          DEFENDANT RANDALL LORD:  Yes, sir.

3          DEFENDANT MICHAEL LORD:  Yes, sir.

4          THE COURT:  In this particular instance, if you come

5  into court with a fixed idea as to what your sentence will be,

6  as long as I sentence you to what you expected, there's no

7  particular problem.  However, should I sentence you to more

8  time than you anticipated, I need you to understand this:

9  You're still bound by the guilty pleas that you've entered,

10  under oath, today to the crimes that you've pleaded to.  Is

11  that clear?

12          DEFENDANT RANDALL LORD:  Yes, sir, it is.

13          DEFENDANT MICHAEL LORD:  Yes.

14          THE COURT:  You may have a right to appeal the

15  sentence that I impose, but that gives you no legal right to

16  withdraw your guilty plea.  Clear enough?

17          DEFENDANT RANDALL LORD:  Yes, sir.

18          DEFENDANT MICHAEL LORD:  Yes, sir.

19          THE COURT:  Since you've acknowledged to me you are

20  in fact guilty as charged, both of you in Count 1 and

21  Mr. Michael Lord in Count 15, since both of you know your

22  rights to a jury trial, what the maximum possible punishment is

23  for the respective crimes, and because you're voluntarily

24  pleading guilty today, I am going to accept your guilty plea as

25  well as the written plea agreements and enter a judgment of

1   guilty on the basis of that plea that each of you have entered.

2          This Court makes the following specific findings of fact:

3   First, that both defendants' pleas are free and voluntary;

4   second, that both fully understand the nature of the charges

5   and possible penalty; third, that the plea agreements in this

6   matter, signed by each of the defendants after being explained

7   by counsel, have been properly executed and filed into the

8   record of today's proceedings; and, fourth, there is a

9   sufficient factual basis for the entry of all pleas, based on

10  the testimony of the witnesses as well as each defendant's own

11  admissions of guilt made today in open court, under oath.

12         The clerk is now ordered to enter pleas of guilty.

13         Mr. Randall Lord, you now stand convicted as charged in

14  Count 1 of the indictment; also Mr. Michael Lord as to the same

15  count in the indictment.  Mr. Michael Lord, you also now stand

16  convicted as charged in Count 15 of that indictment as well.

17         The presentence investigation and written report that we

18  talked about I now order be done.

19         Any letters of support on behalf of these clients of

20  yours, Mr. Carmouche, shall be put together by your office and

21  forwarded to the Court not later than ten days before

22  sentencing so that there is ample time for the Court to review

23  and take those additional sentencing materials into account.

24         Since you have alerted the Court to the fact that there

25  may be some relevant conduct issues pending, I am expecting

 1    from you a full sentencing memorandum with respect to that
 2    relevant conduct.
 3              MR. CARMOUCHE:  We will submit one, Your Honor.
 4              THE COURT:  Same time frame, and you may submit the
 5    additional sentencing materials and the memoranda.
 6         At this time, I'm going to order that your sentencing
 7    memoranda be sealed.  And any objection to that process?
 8              MR. CARMOUCHE:  Not from us, Your Honor.
 9              THE COURT:  Ms. Jernigan?
10              MS. JERNIGAN:  No, Your Honor.
11              THE COURT:  The Government's memorandum shall
12    likewise be sealed in this particular matter pending further
13    orders of the Court.
14         Sentencing is going to be set for August 1, 2016, at 2:00
15    p.m. for Michael Lord; for Mr. Randall Lord, August 1, at 2:30.
16    Both of you may be present in the courtroom when those
17    sentencings begin, and we'll take them up one after the other.
18    Okay?
19              DEFENDANT RANDALL LORD:  Yes, sir.
20              DEFENDANT MICHAEL LORD:  Yes.
21              THE COURT:  Anything further that we need to discuss?
22              MS. JERNIGAN:  No objection to the defendants
23    remaining on bond, Your Honor.
24              THE COURT:  That was the next question that I had.
25    You're now both convicted felons under federal law, and the

 1    presumption is that I take you into custody.  However,

 2    Ms. Jernigan has announced that she has no objection to both of

 3    you being allowed to remain free on bond.

 4         I will reiterate to you that as long as you stay in

 5    compliance with the terms and conditions of your bond, that you

 6    will not have to concern yourselves with being detained.

 7    However, if there is a violation of the terms and conditions of

 8    your bond, you are subject to being taken into custody at that

 9    point and held pending your sentencing, and perhaps designation

10    to the Bureau of Prisons as well.  Is that clear?

11              DEFENDANT RANDALL LORD:  Yes, sir.

12              DEFENDANT MICHAEL LORD:  Yes, sir.

13              THE COURT:  All right.  Ms. Jernigan, any further

14    comment or detail that we need to cover today?

15              MS. JERNIGAN:  Nothing further from the Government,

16    Your Honor.

17              THE COURT:  Mr. Carmouche?

18              MR. CARMOUCHE:  Nothing, Your Honor.

19              THE COURT:  All right.  Very well.  Thank you.

20         (Proceedings concluded at 4:26 p.m.)

21

22

23

24

25

**I N D E X**

                                                                    Page

Direct Examination of Agent Darrin Heusel...............    11

Cross-Examination of Agent Darrin Heusel................    25

Redirect Examination of Agent Darrin Heusel............    26

Direct Examination of Agent Brian Upchurch..............    27

Government Exhibits A, B, and C identified..............    30

Cross-Examination of Agent Brian Upchurch...............    38

Findings of Fact.......................................    67

Certificate

I hereby certify this 25th day of August, 2016, that the
foregoing is, to the best of my ability and understanding, a
true and correct transcript from the record of proceedings in
the above-entitled matter.


                              /s/ Marie M. Runyon
                              Official Court Reporter