UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO. 15-00240-01/02 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| MICHAEL A. LORD AND RANDALL B. LORD | MAGISTRATE JUDGE HORNSBY |

### MEMORANDUM RULING

Before the Court is Defendants Michael A. Lord ("Michael Lord") and Randall B. Lord's ("Randall Lord") (collectively "Defendants") Motion to Withdraw their guilty pleas (Record Document 51). The Government opposes Defendants' Motion. See Record Document 54. For the reasons contained in the instant Memorandum Ruling, Defendants' Motion is **DENIED**.

### FACTUAL AND PROCEDURAL BACKGROUND

Randall Lord is a former chiropractor and resident of Shreveport, Louisiana. See Record Document 1. Michael Lord is Randall Lord's son, and he lives with his father in Shreveport. See id. Beginning in 2013, Defendants began operating a business in which they exchanged cash, credit card payments, and other forms of payment for bitcoins. See Record Document 42 at 11-13 (guilty plea hearing testimony of Darrin Heusel, IRS Criminal Investigations Division). The bitcoin is a decentralized form of online currency that is maintained in an online "wallet." See id. Bitcoins can be purchased from online exchangers or brokers, who often charge a fee for making such an exchange. See id. Bitcoins can then be exchanged for other goods or services online and transferred to another person's wallet. See id. That person can then either use such bitcoins to

purchase other goods and services or convert them back to U.S. dollars or some other traditional form of currency. See id.

Defendants operated their bitcoin business through a website called localbitcoins.com, on which they posted advertisements for bitcoin exchange services. See id. at 14. Persons who engaged Defendants' services would transfer money to Defendants by some traditional means, such as cash or wire transfer. See id. Then, Defendants would purchase bitcoins from Coinbase, another online bitcoin broker, and transfer the bitcoins back to the buyer after subtracting their commission. See id. Though Defendants initially used personal bank accounts for these transactions, they eventually used accounts associated with the following: (1) Randall Lord's former chiropractic clinic, Jewella Chiropractic Clinic; (2) two "doing business as" designations, Crypto Processing Solutions and Quantum Health; and (3) two newly-formed Nevada limited liability companies, Data Security LLC and Pelican Mining LLC. See id. at 12; see Record Document 1 at ¶ 1.

At some point in the spring of 2014, Coinbase contacted Defendants regarding the volume of activity that had been occurring in their account and its consequences. See Record Document 42 at 15-16. Coinbase informed Defendants that because they were acting as bitcoin exchangers they were required to register with the Federal Crimes Enforcement Network ("FinCEN"), a division of the Department of the Treasury, under March 2013 guidance from FinCEN that clarified that bitcoin exchangers were subject to registration requirements. See id. In July 2014, Defendants represented to Coinbase that they were registered with FinCEN, though they were not registered with FinCEN at that time. See id. Defendants did not register with FinCEN until November

2014. See id. By that time, Defendants' bitcoin business had exchanged more than $2.5 million for bitcoins for customers all around the United States. See id. at 15-17. Defendants continued operating the bitcoin exchange business through 2015. See id. at 11-25.

At the same time, Michael Lord became involved in a drug conspiracy. See id. at 27-40 (guilty plea testimony of Richard Brian Upchurch, Department of Homeland Security Investigations Division). Evidently, Randall Lord was not involved in this separate conspiracy. See id. In May 2015, agents of the Department of Homeland Security in San Francisco intercepted a package from China that contained approximately one kilogram of 5F-AB-PINACA, a synthetic cannabinoid that is a controlled substance. See id. at 27-28. The package was addressed to 711 Seventh Street, Springhill, Louisiana. See id. at 28. On May 18, 2015, the Department of Homeland Security conducted a controlled delivery of the package to that address and subsequently arrested Al Hasnat Langhari ("Langhari") in connection with receiving the package. See id.

While discussing this package and other matters in an interview with Homeland Security agents, Langhari stated that he had been a customer of Defendants' bitcoin exchange business on localbitcoins.com, and that he had come to know and trust Michael Lord after several exchanges. See id. at 29. Langhari stated that he and Michael Lord had decided to start a business for the distribution of Xanax, a commercial name for the Schedule IV controlled substance alprazolam, and use the "darknet" website Agora to set up this business. See id. To start this business, they had acquired a pill press, a binding agent to be mixed with alprazolam, a powder containing

alprazolam itself, and a metal part called a "Xanax die." See id. at 29-32. Agents either intercepted these materials in the mail or found all of these materials during a search of a business owned by Langhari's father in southern Arkansas. See id.

After Langhari's arrest, he contacted his girlfriend, Michell Duhé, a student at Louisiana State University in Baton Rouge. See id. at 35-36. He convinced her and several friends of hers to sell what was described as 10,000 Xanax pills to attempt to raise bail money for Langhari. See id. However, the pills were in north Louisiana, and needed to be taken to south Louisiana to be sold. See id. Michael Lord took the pills to south Louisiana and delivered them to a friend of Duhé's, Zach Bajat ("Bajat"). See id. at 36-37. In a subsequent interview with federal agents, Bajat was able to identify Michael Lord out of a six-person lineup as the person who delivered the pills to him. See id. at 37. Michael Lord later denied involvement in this drug conspiracy when interviewed by federal agents in July 2015. See id. at 37-38.

On November 18, 2015, a federal grand jury for the Western District of Louisiana issued a 15-count indictment against Defendants. See Record Document 1. Count 1 of the indictment charged Defendants with conspiracy to operate an unlicensed money service business in violation of 18 U.S.C. § 371 (conspiracy) and 18 U.S.C. § 1960 (unlicensed money transmitting businesses). See id. at 1-3. Counts 2-14 charged Defendants with various other crimes associated with operating their bitcoin exchange business. See id. at 7-16. Count 15 charged Michael Lord with being a member of a drug conspiracy in violation of 21 U.S.C. § 846, 841(a)(1), and (b)(1)(C). See id. at 17. On April 19, 2016, Defendants appeared before this Court and pleaded guilty to Count 1 of the indictment and Michael Lord pleaded guilty to Count 15 of the indictment pursuant

to a plea agreement with the Government. See Record Documents 31, 34, and 35. Defendants filed the instant Motion to Withdraw their guilty pleas on February 21, 2017. See Record Document 51. The Government opposes the Motion, and the Motion is fully briefed. See Record Documents 54 and 57.

## LAW AND ANALYSIS

### I. Legal Standards

Federal Rule of Criminal Procedure 11(d)(2)(B) states that a criminal defendant may withdraw a plea of guilty after the court accepts the plea but before the imposition of a sentence when "the defendant can show a fair and just reason for requesting the withdrawal." Thus, a defendant "does not have an absolute right to withdraw a plea," and a defendant bears the burden of persuading the Court that the reason advanced for withdrawal is "fair and just." United States v. Conroy, 567 F.3d 174, 177 (5th Cir. 2009); Fed. R. Crim. P. 11(d)(2)(B). A district court has discretion to grant or deny such a motion, and a district court's decision on such a motion is reviewed for an abuse of discretion. See Conroy, 567 F.3d at 177.

In deciding a motion to withdraw a guilty plea, the Court must consider the following factors:

> (1) whether or not the defendant has asserted his innocence; (2) whether or not the government would suffer prejudice if the withdrawal motion were granted; (3) whether or not the defendant has delayed in filing his withdrawal motion; (4) whether or not the withdrawal would substantially inconvenience the court; (5) whether or not close assistance of counsel was available; (6) whether or not the original plea was knowing and voluntary; and (7) whether or not the withdrawal would waste judicial resources.

Id. at 178. This factor-based test is a "totality of the circumstances" test in which "no single factor or combination of factors mandates a particular result." Id.

## II. Analysis

The parties' arguments center on the first factor that must be considered in deciding a motion to withdraw a guilty plea, whether Defendants have asserted their innocence. See Record Documents 51-1, 54, and 57. Defendants argue that they "have always believed that their buying and selling of bitcoins did not make them a money services business ("MSB") and therefore, they were not required to obtain a license to operate their business." Record Document 51-1 at 2. Defendants also argue that they have now confirmed with the State of Louisiana's Office of Financial Institutions ("OFS") that the State of Louisiana does not require a license for persons to engage in exchanging or brokering bitcoins. See id. at 2-3.

The Government concedes that Defendants were not required to obtain an MSB license from the State of Louisiana to operate such a business. See Record Document 54 at 12. However, the Government argues that this concession is not fatal to the charges against Defendants in Count 1 of the indictment because the failure to obtain a state license was but one theory upon which Count 1 is based. See id. The Government also argues that most of the other factors that must be considered weigh in favor of denying the Motion. See id. at 11-17. Defendants devote no argument to whether Michael Lord should be allowed to withdraw his guilty plea to Count 15 of the indictment for his role in a drug conspiracy. See Record Documents 51-1 and 57.

**A. Defendants May Not Withdraw Their Guilty Pleas to Count 1.**

The Government's argument on the first factor, whether Defendants have asserted their innocence, is correct. Defendants correctly argue, and the Government has conceded, that the fact that the State of Louisiana does not require a license to

operate an MSB precludes one theory upon which Count 1 of the indictment is based. See Record Documents 51-1 and 54.

However, Count 1 of the indictment charged Defendants with conspiracy to operate an unlicensed MSB under 18 U.S.C. § 371 (conspiracy) and 18 U.S.C. § 1960 (unlicensed money transmitting businesses). Under 18 U.S.C. § 1960, a person commits an offense when he "knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business." The statute defines the term "unlicensed money transmitting business" as "a money transmitting business which affects interstate or foreign commerce in any manner or degree" and either (A) is operated without an appropriate money transmitting license in a State; or (B) fails to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330 or regulations thereunder. 18 U.S.C. § 1960(b)(1)(A) and (B). Thus, the statute sets forth two separate methods by which the Government may prove that a defendant is an "unlicensed money transmitting business": failure to obtain a state license where such a license is necessary, or failure to comply with separate federal registration requirements.

Though the Government now concedes that it cannot prove the first method, the evidence the Government presented at the guilty plea hearing is nonetheless sufficient to prove the second method. Regulations promulgated under 31 U.S.C. § 5330 and other statutes define a "money service business" as a business engaging in at least one of several different varieties of financial business. 31 C.F.R. § 1010.100(ff). One such variety is a "money transmitter," a person that engages in "the acceptance of currency, funds, or other value that substituted for currency from one person and the transmission

of currency, funds, or other value that substituted for currency to another location or person by any means." 31 C.F.R. § 1010.100(ff)(5)(A). All businesses that meet the definition of "money services businesses" must register with FinCEN through the registration procedures set forth in 31 C.F.R. § 1022.380. One such requirement is that an MSB must submit its registration form to FinCEN within 180 days of the date the business is established. See 31 C.F.R. § 1022.380(b)(3).

As stated in the Factual and Procedural Background, *supra*, FinCEN released interpretive guidance in March 2013 clarifying the application of these regulations to businesses like that of Defendants. See Dept. of the Treasury, FinCEN, FIN-2013-G001, https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf (March 18, 2013). This guidance clarified that though a user of a virtual currency like bitcoin is not an MSB, "an administrator or exchanger *is* an MSB under FinCEN's regulations, specifically, a money transmitter, unless a limitation to or exemption from the definition applies to the person." See id. at 1 (emphasis in original). It is undisputed that Defendants failed to register with FinCEN until November 2014, well past the 180-day deadline for such registration, which commenced sometime in 2013 when Defendants first began their bitcoin exchange business. See Record Document 42 at 11-25 (guilty plea testimony of Darrin Heusel, IRS Criminal Investigations Division). Thus, because "it is unlawful to do business [as an MSB] without complying with 31 U.S.C. § 5330 and [31 C.F.R. § 1022.380]" regardless of compliance with any state licensing requirements, the Court finds that Defendants have not asserted their actual innocence of the crime to which they pleaded guilty in Count 1 of the indictment. 31 C.F.R. § 1022.380(e).

Most of the other factors to consider in deciding a motion to withdraw a guilty plea also weigh in favor of denying the instant Motion. On the second factor, the Court finds that the Government would suffer some prejudice if the Motion were granted, as it would be required to prove the allegations in the indictment at trial.

On the third factor, the Court finds that the Defendants have delayed in filing the instant Motion to Withdraw their guilty plea. Defendants were aware that the State of Louisiana does not require a license for operating a bitcoin exchange business by August 2016. In a Sentencing Memorandum in August 2016, Defendants attached a letter determination from the Louisiana OFS to another bitcoin exchanger. See Record Document 43-2. That letter stated that such a business was not required to obtain a license from the State of Louisiana. See id. Thus, Defendants were aware that the State of Louisiana does not require such a license by August 2016 at the latest. In the instant Motion, Defendants assert that they have also recently contacted the OFS themselves to confirm this fact, and that the OFS confirmed that Louisiana does not require such a license. See Record Document 51-1 at 2-3. However, Defendants did not file the instant Motion until February 2017 when they knew that no state license was required by August 2016 at the latest. See Record Document 51. Thus, they waited almost six months after learning of the facts constituting the basis for the instant Motion before filing the Motion, a significant delay.

On the fourth factor, the Court finds that though withdrawing the guilty plea may not *substantially* inconvenience the Court, it would nonetheless require the Court to hold a multi-day trial on fifteen separate counts. Thus, granting the instant Motion would result in at least some inconvenience to the Court. On the fifth factor, the Court finds

that the assistance of counsel was available to Defendants throughout the instant action. Defendants were represented by extremely experienced criminal defense counsel from the first day of these proceedings, as their counsel enrolled in this case on the date of Defendants' initial appearance. See Record Document 16.

On the sixth factor, the Court finds that the plea to Count 1 was knowing and voluntary. At their guilty plea hearing, the Court questioned Defendants extensively, asking questions regarding their competence to enter a guilty plea, their waiver of significant constitutional rights, whether they were in fact guilty as charged, whether their decision to plead guilty was free and voluntary, and whether their decision to plead guilty was made with the advice and consent of their attorney. See Record Document 42 at 43-50. Nothing in Defendants' responses to these questions brought the voluntary nature of the guilty plea into question, challenged the ability of the Government to prove its case against Defendants, or indicated that Defendants had decided to plead guilty without the advice of counsel. See id. On the seventh factor, the Court finds that allowing Defendants to withdraw their guilty pleas would waste some judicial resources, such as the time expended on the guilty plea hearing. Thus, the Court finds that the factors it must consider in deciding whether Defendants have presented a "fair and just" reason to withdraw their guilty pleas to Count 1 weigh in favor of denying the instant Motion. Fed. R. Crim. P. 11(d)(2)(B).

**B.  Michael Lord May Not Withdraw His Guilty Plea to Count 15.**

Defendants' Motion contains no arguments related to Michael Lord's guilty plea to Count 15 of the indictment, the count accusing him of participation in a drug conspiracy. See Record Document 51-1. Thus, it is unclear whether Michael Lord

actually seeks to withdraw his guilty plea as to Count 15, but because of the somewhat broad language used in the Motion itself, the Court will address Count 15 as well. See id. Michael Lord has presented no arguments that constitute a "fair and just" reason for withdrawing his guilty plea on this count, and does not claim innocence of that count. Fed. R. Crim. P. 11(d)(2)(B). The analysis of the other relevant factors is similar to the analysis of these factors for Count 1 in Section II, B, *supra*. Thus, Michael Lord may not withdraw his guilty plea on Count 15.

## CONCLUSION

The ability to withdraw a guilty plea with approval of the Court is "not intended to allow a defendant to withdraw his guilty plea simply because he has changed his mind after further reflection." United States v. Daniel, 866 F.2d 749, 751 (5th Cir. 1989). Defendants failed to provide a "fair and just" reason for the Court to permit withdrawal of their guilty pleas. Fed. R. Crim. P. 11(d)(2)(B). Most of the factors the Court must consider in deciding a motion to withdraw a guilty plea weigh in favor of denying the instant Motion. Therefore, Defendants' Motion to Withdraw their guilty pleas (Record Document 51) is **DENIED**.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, on this the 20th day of April, 2017.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE